IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **MARK A. DEGIRONNE,**  Plaintiff,  v.  **DOUGLAS FURLONG,**  Defendant. | **CASE NO. 08 C 5696**  Hon. Harry D. Leinenweber |

**MEMORANDUM OPINION AND ORDER**

Presently before the Court are Defendant's Motion for Summary Judgment in Plaintiff's suit under 42 U.S.C. § 1983 and Plaintiff's Motion to Bar Defendant's Expert Witness. For the following reasons, Defendant's Motion for Summary Judgment is **denied.** Plaintiff's Motion to Bar Defendant's Expert Witness is **granted in part and denied in part.**

I. BACKGROUND

Plaintiff Mark Degironne (hereinafter, "Degironne") brings this lawsuit against Douglas Furlong (hereinafter, "Officer Furlong" or "Furlong"), an officer of the New Lenox, Illinois police force. On November 4, 2007, Officer Furlong was on patrol when he received a dispatch from the Will County Sheriff's Department indicating that the windows of the Gyro Shack had been

broken and that the suspect was a white male driving an "older model" red F-150 Ford pick-up truck. Shortly afterwards, Officer Furlong stopped Degironne, a white male driving an older-model (1994) red F-150 Ford pick-up truck at a location about a five-minute drive from the scene of the crime and traveling in the direction that the suspect car was going when it left the scene.

As Officer Furlong approached the truck, he saw Degironne make what Furlong perceived to be a "furtive movement" below and to the side of his seat. Degironne admitted that he reached toward the glove box to get his wallet, which contained his license, registration, and proof of insurance. According to Degironne, Officer Furlong asked for permission to search the truck for a crowbar that was used in a vandalism and that, if he had no crowbar, he could leave. Degironne states that he never gave Officer Furlong permission to search his truck. Officer Furlong contends that Degironne gave him permission to search the truck for any weapons or tools that might have been used to perform "such a crime" as the breaking of windows.

The officer found no tools likely to have caused criminal damage to the Gyro Shack, but went on to remove, open, and search an eight-inch-long sunglass' case found under the driver's seat, in which he found cocaine. Officer Furlong also found a brown paper

bag containing a six-pack of beer from which two cans had been removed and a Burger King cup containing a tool socket and a Brillo pad, which the officer perceived to be a pipe used to ingest crack cocaine.  There is no evidence that Degironne showed any signs of intoxication.  While police were searching Degironne's truck, a witness to the Gyro Shack incident was brought to the scene and determined that Degironne was *not* the perpetrator of that crime.

Degironne was arrested and charged with felony possession of cocaine.  His truck was towed and impounded, and forfeiture proceedings were begun.  Degironne moved to suppress the cocaine as the fruit of an unconstitutional search.  A state court judge found the search of the sunglass' case unreasonable under the Fourth Amendment because it could not have held an instrument for smashing windows.  Furthermore, the state court held that finding the tool socket and Brillo did not give Furlong probable cause to look for drugs in the sunglass' case because the officer opened the sunglass' case first.  The court granted Degironne's motion to suppress.  The felony charge was dismissed, and Degironne's truck was returned to him about eight months after it was seized.

Degironne then filed this action against Officer Furlong under 42 U.S.C. § 1983.  Furlong now moves for summary judgment.

Degironne moves to bar the testimony of Furlong's expert witness, Robert T. Johnson, a law enforcement expert.

## II. DISCUSSION

### A. Defendant's Motion for Summary Judgment

The summary judgment motion involves two issues: (1) whether Defendant is collaterally estopped from relitigating the constitutionality of the search of the truck, and (2) assuming that Defendant is not collaterally estopped, whether the undisputed facts of the case show that the search was justified and that Defendant is entitled to judgment as a matter of law.

#### *1. Standard of Review*

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. A fact is material if it could affect the outcome of the suit under the governing law, and a dispute is genuine where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court's role when ruling on a motion for summary judgment is not to weigh the evidence or determine the truth of the matter, but to determine whether there is a genuine

issue of material fact that warrants trial. *Id*. at 249. In making this determination, the court must view all the evidence and draw any reasonable inferences therefrom in the light most favorable to the nonmoving party. *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000).

### *2. Collateral Estoppel*

Collateral estoppel is an equitable doctrine that precludes parties from relitigating, in certain situations, issues that were already decided in a previous proceeding. *Ill. Health Maint. Org. Guar. Ass'n v. Dep't of Ins.*, 864 N.E.2d 798, 809 (Ill.App.Ct. 2007). Collateral estoppel may be applied where: (1) the issue decided in the earlier adjudication is identical to the issue in the later suit; (2) there was a final adjudication on the merits in the earlier suit; and (3) the party against whom estoppel is asserted was a party to the earlier suit, or was in privity with a party. *Id.* Plaintiff argues that, since the state court has already decided that the search was unreasonable, this Court cannot reconsider the issue.

This Court must give to the state court judgment the same preclusive effect that it would have in the State of Illinois. *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). Whether Plaintiff may invoke collateral estoppel in this

case turns on the issue of whether Defendant was a party, *or in privity with* a party, in the original court case.  As the original felony case was a prosecution by the State of Illinois against Plaintiff, Defendant was not a party, even though he did testify for the State.

The question, then, is whether Officer Furlong was in privity with the State of Illinois in the earlier proceeding.  To be "in privity" for the purposes of collateral estoppel, two parties do not need to be identical, but they must be so closely aligned that they represent the same legal interest. *Kraushaar v. Flanigan*, 45 F.3d 1040, 1050 (7th Cir. 1995).  Furthermore, the party against whom collateral estoppel is asserted must have been given a full and fair opportunity to litigate the issue in the prior proceeding. *Id.* at 1051.

The parties do not cite, and the Court has not found, any Illinois State cases that directly address the question of whether a law enforcement officer is in privity with the State in a criminal prosecution of a defendant, but the general rule among jurisdictions is that they are not in privity.  For example, the Fifth Circuit, interpreting Texas law, has held that police officers were not in privity with the State in a criminal prosecution because the officers (1) did not control the

proceedings, but were merely witnesses; (2) did not participate in the questioning of witnesses; (3) could not influence trial strategy; (4) could not appeal the suppression ruling; and (5) did not have identical interests to the State, whose primary objective was to convict the defendant, not to show that the officers did their jobs properly. *McCoy v. Hernandez*, 203 F.3d 371, 374 (5th Cir. 2000). *See also Duncan v. Clements*, 744 F.2d 48, 51-52 (8th Cir. 1984).

The same reasoning applies in this case. Although the State and Furlong both presumably wanted the same result from the suppression hearing, namely, that the suppression motion be denied, their interests were not identical. The State's goal was to protect the public from cocaine by convicting Degironne, not necessarily to vindicate Officer Furlong's actions against accusations of wrongdoing. Furthermore, Officer Furlong, although he did testify at the suppression hearing, was not in control of the questioning or the litigation strategy. As Furlong points out, there were arguments he could have made to defend his actions that the State did not make at the suppression hearing. Thus, he did not have a full and fair opportunity to litigate the issue. *See Haring v. Prosise*, 462 U.S. 306, 313-17 (1983).

Additionally, rulings in motions to suppress are not usually seen as final judgments on the merits. *See, Best v. City of Portland*, 554 F.3d 698, 701 (7th Cir. 2009). This also counsels against treating the suppression ruling as preclusive.

For these reasons, the doctrine of collateral estoppel may not be applied against Officer Furlong, and he may relitigate the constitutionality of the search.

### *3. Constitutionality of the Search*

There is no dispute that Officer Furlong had reasonable suspicion for the initial stop of Degironne's truck, based on the somewhat detailed description in the radio dispatch, which closely matched Degironne and his vehicle. Furthermore, the Court finds that Furlong had probable cause, based on the radio dispatch, to search the truck's interior for instruments that might have been used to smash windows at the Gyro Shack, *see United States v. Young*, 38 F.3d 338, 340-41 (7th Cir. 1994), and to search any containers that might have been used to hold such instruments, *see United States v. Ross*, 456 U.S. 798, 824 (1982).

#### *a. Search of Sunglass' Case*

Furlong's search of the sunglass' case, however, is more questionable because the sunglass' case is unlikely to have held a tool that might have been used for window-smashing. Furlong

argues, however, that the sunglass' case could have held a type of spring-loaded device designed to break automobile glass.

The Court finds that this argument raises factual issues that are not resolved by the evidence now before it. As to whether the sunglass' case might have contained a tiny device for breaking glass, the Court does not have enough information to say whether such devices are prevalent enough to make the search objectively reasonable. An action is reasonable under the Fourth Amendment, regardless of the officer's state of mind, as long as the totality of circumstances, viewed objectively, justifies the action. *People v. Wear*, 893 N.E.2d 631, 644 (Ill., 2008). The less widespread the existence of such small, glass-breaking instruments in society, the less reasonable a search of the sunglass' case for such an item would be.

### b. Search for Weapons

Furlong also argues that Degironne made a "furtive movement" toward the area below his seat and made other "jerky movements" that gave Furlong reasonable suspicion to think that Degironne had a weapon. This also would have justified the search of the sunglass' case, according to Furlong, because the case could have held a knife or small gun. *See Terry v. Ohio*, 392 U.S. 1 (1968). Furlong presents as evidence a police video of Degironne's stop and

arrest. After Degironne stops his truck, but before Furlong has approached the vehicle, Degironne can be seen reaching down and to his right as if to retrieve or place an object under his seat. He can also be seen looking around from time to time, but it is a matter of opinion whether his movements can be characterized as furtive or jerky. Officer Furlong testified that when he sees someone reaching down or over, it "sparks" his "caution."

A trier of fact, however, might reasonably find nothing in Degironne's behavior in the video to spark his caution. Within one minute after Degironne stopped his truck, there were a total of three police officers, including Officer Furlong, standing on either side of it. After Degironne handed something, presumably his license, registration, and proof of insurance, to Officer Furlong, all three officers walked away from Degironne's truck, presumably to run Degironne's information through a computer, and stayed completely out of view of the camera for over a minute and a half.

If any of the officers had an inkling that Degironne was armed, this behavior seems incongruous. A minute and a half would have been ample time for Degironne to reach under his seat and pull out a gun, if he had one there. While the officers' subjective state of mind is not determinative of the legality of the search,

- 10 -

see *Wear*, 893 N.E.2d at 644, their nonchalant behavior may be considered by the trier of fact in weighing whether Degironne's seemingly insignificant actions were sufficient to raise alarm that he may have been armed and dangerous. Certainly, the Court cannot say that there are undisputed facts regarding Degironne's behavior that entitled Officer Furlong, as a matter of law, to search the truck for weapons.

### c. *Inevitable Discovery*

Next, Officer Furlong argues that the cocaine would have inevitably been discovered based on the finding of the four cans of beer in the truck. *See Nix v. Williams*, 467 U.S. 431, 443-444 (1984) (adopting "inevitable discovery" rule). His reasoning is as follows: Officer Furlong had a right to search the paper bag with the beer cans because it was large enough to hold tools that could have been used in the vandalism incident. Once he found the four cans of beer, held together on a plastic ring as part of a "six-pack," he rightly wondered what had happened to the other two cans. He saw the Burger King cup and reasonably inferred that Degironne might have emptied some beer into the cup. If so, he would have been driving with an open container of beer, or possibly driving under the influence of alcohol, both of which are illegal. This justified his removing the lid from the Burger King cup. Once he

did so and found the tool socket and Brillo, which he took to be drug paraphernalia, he was justified in searching the car for illegal drugs, and this would have allowed him to search any container that could have held drugs, such as the sunglass' case. Thus, the cocaine would inevitably have been discovered through a legally justified search.

The Court agrees with Furlong's reasoning up until he finds the tool socket and Brillo. The Court considers it a question of fact whether ordinary items such as these, which have many innocent uses, should reasonably be seen as indicators of the presence of drugs.

Illinois law holds that "[s]imply because a product can be used with drugs does not indicate that the product is primarily for drug use." *People v. Hughes*, 798 N.E.2d 763, 770 (Ill.App.Ct. 2003) (finding evidence insufficient to prove that scales, syringes, coffee filters, blister packs of tablets containing pseudoephedrine, lithium batteries, and plastic hose were drug paraphernalia). The legislature has defined drug paraphernalia as that which is "peculiar to and marketed for use" with illegal drugs. *Id.* at 769.

Tool sockets and Brillo clearly do not qualify as "peculiar to and marketed for use" with illegal drugs. Degironne therefore

could not have been charged with possession of drug paraphernalia for having these items. But that does not necessarily mean that Officer Furlong would have lacked probable cause to search for drugs once he saw the Brillo and tool socket. The question is whether the presence of these two items would reasonably lead a person to believe that there were illegal drugs in the truck. This is a question for the trier of fact.

### d. Consent

Finally, there is a genuine issue of material fact as to whether Degironne gave Officer Furlong permission to search his truck. Degironne adamantly says that he didn't and that Furlong only asked permission to search the truck for a crowbar. Officer Furlong's testimony itself is inconsistent, stating sometimes that he asked to search for weapons that might have been used in the Gyro Shack incident, and other times that he asked for consent to search for anything he should be "concerned" about, *i.e.*, anything illegal.

If Degironne gave Furlong voluntary, *carte blanche* permission to search the truck, then all of the officer's searches were legal, and Degironne has no case. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (holding voluntary consent to search creates exception to requirement of warrant or probable cause to search).

If Degironne gave limited consent, such as permission to look for a crowbar, or for weapons that might have been used to smash windows, or even if Degironne completely denied consent to search, the case then turns on the questions the Court has addressed above – whether Officer Furlong had probable cause to open the sunglass' case, or to search for weapons, or whether other legally found evidence would have inevitably led him to have probable cause to search for drugs.

The evidence before the Court cannot settle the consent issue. Degironne's and Furlong's testimonies are completely at odds. Furlong claims that the police video shows Degironne making a gesture toward his truck indicating consent to search. The Court finds the video inconclusive, especially since Degironne's and Furlong's conversation is not audible. Degironne's gesture could signify either that he is welcoming a search or resigning himself to the overwhelming threat of government force. Furlong might have made it clear to Degironne that he was going to search the truck whether Degironne liked it or not. Degironne's gesture toward the truck might then be an ironic act of resignation. As the viewer cannot hear the words spoken, there is no way to be sure. Because this is a motion for summary judgment against Degironne, the Court

must construe the evidence in his favor. The consent issue therefore leaves genuine issues for the trier of fact to determine. For the foregoing reasons, the motion for summary judgment is denied.

**B. Plaintiff's Motion to Bar Defendant's Expert Witness**

Degironne moves to bar the testimony of Furlong's expert witness, Robert T. Johnson, a law enforcement expert. Mr. Johnson intends to testify, *inter alia*, that (1) Officer Furlong had legal justification to conduct a search/frisk for weapons in order to protect himself from harm, which allowed him to search the Burger King cup and sunglass' case; (2) Furlong had authority to search the truck based on Degironne's consent; and (3) Furlong would have had authority to look in the sunglass' case if he had done his search in a different sequence, finding the beer cans and alleged drug paraphernalia before the sunglass' case.

*1. Standard of Review*

Federal Rule of Evidence 702 permits an expert witness to testify regarding specialized knowledge if it will assist the trier of fact to understand the evidence or to determine a fact in issue, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and

(3) the expert has applied the principles and methods reliably to the facts of the case.

## *2. Analysis*

The Court does not question that Mr. Johnson's experience and training qualify him as an expert on law enforcement procedures. The Court finds in this case, however, that much of the testimony he intends to give would not be helpful to the trier of fact. Mr. Johnson proposes to testify as to whether Officer Furlong had legal authority to search the truck for weapons and whether his search of the sunglass' case would have been legal if it had occurred in a different sequence. These are legal conclusions that are the province of the Court. They are properly determined by the Court based on legal precedent and argument as provided by the attorneys. The Court sees no need for Mr. Johnson's testimony on theses' issues.

Additionally, Mr. Johnson would testify that Officer Furlong had authority to search the truck based on Degironne's consent. His opinion, however, is contingent on Degironne's actually having given consent. Mr. Johnson's testimony on this point would not add anything to what the Court already knows. The law is clear that the search was legal if Degironne gave voluntary consent. *See Bustamonte*, 412 U.S. at 219. But there is a factual dispute as to

whether Degironne gave his consent. This is a question that will most likely turn on the credibility of the witnesses' testimony in open court, a matter that falls entirely within the province of the trier of fact.

The Court therefore grants Degironne's Motion to bar Mr. Johnson's testimony insofar as it relates to Officer Furlong's legal authority to stop or search Degironne or his truck.

As delineated above in the summary judgment discussion, however, there are two factual issues in which Mr. Johnson's expertise may be of value to the trier of fact. Furlong argues that Mr. Johnson may offer information about small impact implements that may not be within the common knowledge of the trier of fact. The Court considers that such information may help to determine the reasonableness of the search of the sunglass' case. Additionally, if Mr. Johnson has knowledge of the use of tool sockets and Brillo as drug paraphernalia, such information would also be helpful to the trier of fact.

Provided that Mr. Johnson can establish himself, under Federal Rule of Evidence 702, as having knowledge or expertise of the above two factual matters, he may testify to them. Insofar as these matters are concerned, Degironne's motion is denied.

### III. <u>CONCLUSION</u>

For the reasons stated herein, Defendant's Motion for Summary Judgment is **denied**.  Plaintiff's Motion to Bar Defendant's Expert Witness is **granted in part and denied in part.**
**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　　／s／ Harry D. Leinenweber
　　　　　　　　　　　　　　　　　　　　　Harry D. Leinenweber, Judge
　　　　　　　　　　　　　　　　　　　　　United States District Court

**DATE:**　　　5/14/2010